IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TONDRA PRIDDY,                        )
                                      )
                 Plaintiff,           )
                                      )
        v.                            )          1:18CV405
                                      )
MOSES H. CONE MEMORIAL                )
HOSPITAL OPERATING                    )
CORPORATION, a North                  )
Carolina Corporation;                 )
                                      )
                 Defendant.           )

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

From 1988 until her termination in 2017, Plaintiff, Tondra Priddy, worked as a registered nurse for Defendant, Moses H. Cone Memorial Operating Corporation. (ECF No. 49 ¶ 2.) She brings this action against her former employer, alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, as well as a claim of wrongful termination in violation of North Carolina public policy. (ECF No. 34 ¶¶ 1, 3–4.) Before the Court is Defendant's Motion for Summary Judgment. (ECF No. 46.) For the reasons set forth below, Defendant's motion will be granted.

## I.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

1

R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (quotations omitted). The role of the court at summary judgment is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324. The judicial inquiry on summary judgment "thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of

2

admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## II.   BACKGROUND

On January 13, 2017, Plaintiff met with her supervisor, Patty Phillips ("Phillips"), to discuss Plaintiff's work performance. (*See* ECF No. 47-1.) At the meeting, Phillips expressed concern with Plaintiff's work attendance, her incomplete "skills checklist" form, and her "[r]esponse in an emergency" ("the Rapid Response Incident"). (*Id.*) A few days later, on January 17, Plaintiff again met with Phillips, who was now accompanied by Jonna Hunter ("Hunter"), the director of Plaintiff's unit. (*See* ECF Nos. 47-11; 49-7 at 4.) During their meeting, Hunter and Phillips gave Plaintiff a week to complete her skills checklist and—in response to the Rapid Response Incident discussed below—"research anaphylactic and allergic reaction[s]" and review Defendant's rapid response policy.[1] (ECF No. 47-11.) Plaintiff was informed that if she did not complete these tasks by January 24, she would be fired. (*Id.*) The following day, Hunter learned of another incident involving Plaintiff and a patient ("the Vaccination Incident"). (ECF No. 47-1.) According to Hunter, "as this [was] the [fourth] occurrence [involving Plaintiff] to be addressed in a week," Defendant decided to terminate Plaintiff. (*Id.*) Plaintiff was fired on January 20, 2017. (ECF No. 49 ¶ 39.)

As this case centers around whether Plaintiff was fired because of the four issues Hunter identified—Plaintiff's attendance; the skills checklist; and the Rapid Response and Vaccination incidents—or for impermissible reasons (FMLA interference and retaliation, or

---

[1] As explained below, Defendant's rapid response policy was a protocol for how nurses working outside of the ICU should handle medical emergencies.

Case 1:18-cv-00405-LCB-JLW   Document 52   Filed 05/21/20   Page 3 of 27

age discrimination), the Court will examine further each identified issue that Defendant claims culminated in Plaintiff's discharge.

### A. Plaintiff's Requests for FMLA Leave

According to Defendant, Plaintiff was absent without excuse five times in the six months before she was fired. (ECF No. 47 at 8 & n.4.) Plaintiff contends she was permitted to be absent on these days because she was taking FMLA leave. (*See* ECF No. 48 at 16–17.) Plaintiff's attendance issues implicate two types of FMLA leave: her request for intermittent leave to care for her father—which Defendant approved—and her request for intermittent personal FMLA leave—which Defendant denied. Plaintiff's intermittent parental leave started on March 17, 2016 and was set to expire on March 16, 2017. (ECF No. 48-1.) Separately, Plaintiff applied for personal FMLA leave on October 18, 2016. (ECF No. 49 ¶ 17.) Her request was denied on November 9, 2016. (*Id.* ¶ 18.)

### B. Plaintiff's Skills Checklist

Defendant required nurses to attend a "skills fair" in January of 2016, to complete a skills checklist while at the fair, and to "retain[ ] the paper checklist until the end of [the] year when employee appraisals were completed in approximately November." (*Id.* ¶ 33.) According to Plaintiff, she completed her skills checklist in January 2016, and provided two copies of the checklist to others for safekeeping. (*Id.* ¶ 34.) However, by late September, shortly before Plaintiff was required to turn in her skills checklist, Plaintiff realized that she no longer knew where her paper copy was located. (*See* ECF Nos. 47-30 at 2; 49 ¶ 34.) Plaintiff did not recover her checklist or otherwise complete a skills checklist prior to her meetings with Phillips and Hunter in January 2017. (*See* ECF Nos. 47-1; 47-9; 47-11.)

4

## C. The Rapid Response Incident

On the night of January 10, 2017, Plaintiff was part of a group of medical workers who assisted a patient having an allergic reaction. (ECF No. 49 ¶ 30.) The patient first alerted Plaintiff that her throat was swelling and felt tight at 10:24 p.m. (ECF No. 47-8 at 3.) Over the course of the next hour, Plaintiff helped care for the patient. (*Id.*; ECF No. 49 ¶ 30.) At 11:20, "the patient broke out in hives . . . and her lips swelled." (*See* ECF Nos. 47-8 at 4; 49 ¶ 30.) At this time, Plaintiff initiated Defendant's rapid response procedure. (ECF No. 49 ¶ 30.) Defendant's Rapid Response Team ("RRT") is meant to provide "early and rapid intervention for patients outside the ICU setting whose condition is deteriorating." (ECF No. 47-6 at 2.) After a nurse and a physician from the RRT arrived and "the patient's symptoms subsided," Plaintiff asked the RRT nurse if she could leave to attend to other patients. (ECF No. 49 ¶ 30.) The RRT nurse said no. (*Id.*) The following day, the RRT nurse emailed Phillips and Hunter to express her concern that Plaintiff had attempted to leave a patient during an emergency to care for other patients. (ECF No. 47-10.) Plaintiff, for her part, argues that she activated the RRT at an appropriate time and "was exercising good patient care when [she] inquired about checking in on [her] other patients." (*See* ECF No. 49 ¶ 30.)

## D. The Vaccination Incident

The final issue identified by Defendant as leading to Plaintiff's termination occurred on January 17, 2017, after Plaintiff's meeting with Phillips and Hunter, when Plaintiff took over care of a patient from another nurse, Sydney Noble. (*Id.* ¶ 36.) Noble informed Plaintiff that the patient had asked for a flu shot. (*Id.*) Plaintiff did not communicate with the patient about the shot, and states that she informed the nurse who replaced her, Trisha Glime, both

5

that the patient needed the shot and that Plaintiff had not discussed the matter with the patient. (*Id.*)  Glime then vaccinated the patient who, in fact, had already been vaccinated, resulting in an unnecessary second vaccination.  (*See* ECF No. 47-13.)  Glime later stated: "I felt that the information that was given to me was checked out by [Plaintiff].  I trusted her report and made a medical error."  (*Id.* at 3.)  Plaintiff responds that she "was not responsible for the patient receiving two flu vaccinations because [she] was not the nurse who administered the vaccination."  (ECF No. 49 ¶ 40.)

## III.  DISCUSSION

As a result of her termination, Plaintiff asserts four claims against Defendant: (1) interference with Plaintiff's FMLA rights; (2) retaliation in violation of the FMLA; (3) wrongful discharge in violation of the ADEA; and (4) wrongful discharge in violation of North Carolina public policy.  (ECF No. 34 ¶¶ 30–52.)

### A.  Interference with FMLA Rights

Defendant first argues that it is entitled to summary judgment on Plaintiff's claim for FMLA interference.  (ECF No. 47 at 10–14.)  The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right under the FMLA.  29 U.S.C. § 2615(a)(1).  An employer interferes with a right under the FMLA when it takes any "action with a reasonable tendency to 'interfere with, restrain, or deny' the 'exercise of or attempt to exercise' an FMLA right."  *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 165 (D.C. Cir. 2015) (quoting 29 U.S.C. § 2615(a)(1)).  "To make out an 'interference' claim under the FMLA, an employee must . . . demonstrate that (1) [s]he is entitled to an FMLA benefit; (2) [her] employer interfered with the provision of that benefit; and (3) that [the]

Case 1:18-cv-00405-LCB-JLW   Document 52   Filed 05/21/20   Page 6 of 27

interference caused harm." *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015).

An employer does not interfere with an employee's FMLA rights simply by attempting "to verify the [employee's] claimed medical condition." *See id.* For instance, and crucially for this claim, prior to approving a request for FMLA leave, an employer may require an employee to submit a medical certification prepared by the employee's health care provider explaining when the employee's health problem arose and how long it can be expected to last. 29 U.S.C. § 2613(a)–(b); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 383 (4th Cir. 2001). If an employer chooses to request a medical certification, it must give the employee seeking leave at least "15 calendar days after the employer's request" to provide the certification. 29 C.F.R. § 825.305(b). If the employee then fails to provide the certification, her employer may deny her requested leave. *Id.* § 825.305(d); *Ryder v. Shell Oil Co.*, 652 F. App'x 234, 235 (5th Cir. 2016) ("Under the FMLA, an employer may require medical certification to support an employee's request for leave; if the employee fails to provide that certification, the employee is not entitled to FMLA leave."); *Ahmed v. Salvation Army*, 549 F. App'x 196, 197 (4th Cir. 2013) (affirming grant of summary judgment for employer where the employee "never submitted a completed certification form" and thus the employer's "duty to provide FMLA leave was not triggered").

Here, Plaintiff claims that Defendant interfered with her FMLA rights by improperly denying her request for personal FMLA leave without providing her the fifteen days required by law to submit the medical certification Defendant requested. (*See* ECF No. 48 at 12.) Defendant agrees that "Plaintiff would have been entitled to FMLA leave if she had complied with [Defendant's] policies by submitting appropriate certification of a serious health

condition." (ECF No. 47 at 13.) However, Defendant argues that Plaintiff failed to submit her certification on time and so cannot show that she was entitled to FMLA benefits. (*See* ECF Nos. 47 at 11; 50 at 5.) As set forth below, because the undisputed evidence in the record demonstrates that Plaintiff failed to provide Defendant with a completed medical certification within fifteen days of Defendant's request, Defendant is entitled to judgment as a matter of law as to this claim.

<blockquote>i.     *Defendant's procedure for requesting FMLA leave*</blockquote>

To initiate a request for FMLA leave, Defendant's employees are required to call the intake center of Matrix, Defendant's third-party administrator for leaves of absence. (ECF Nos. 47-18 at 3–4; 50-1 at 2.) Once an employee contacts Matrix, Matrix (1) certifies her eligibility for leave; (2) obtains contact information for her physician; and (3) sends her an email and "a packet in the mail," highlighting what leaves she is eligible for, as well as what steps she must take to ensure her leave is approved. (ECF Nos. 47-18 at 3–4; 47-20.)

The email, which is sent the same day as the intake session, contains a letter ("the Initial Letter") informing the employee that to obtain leave, she must complete a "Certification of Heath Care Provider Form" within fifteen days of receipt of the Initial Letter, that is, within fifteen days of her intake session. (*See* ECF No. 47-20 at 2.) Similarly, the packet of information mailed to employees ("the Packet") contains an "employee checklist" advising the employee to "read the following information carefully . . . to avoid delays in the evaluation of your leave." (ECF No. 47-19 at 4.) The first item on the checklist calls for the completion of the Health Care Provider Certification. (*Id.*) The checklist informs the employee that:

<blockquote>As a courtesy, Matrix has faxed a copy of this certification form directly to your Health Care Provider (HCP). Matrix will contact you if we do NOT receive a</blockquote>

8

> response from your HCP within 10 business days. We have provided a copy of
> this form in this packet to assist you in following up with your HCP. This form
> ONLY needs to be completed and returned in the event that you hear from
> Matrix requesting assistance. We recommend that you contact your HCP to
> ensure that they have received and are completing this form on your behalf.

(*Id.* (emphasis omitted).) Under the separate heading "Your Responsibilities and Special Reminders," the Packet further advises: "[e]nsure your medical certification is completed and returned to Matrix within 15 calendar days from date of intake." (*Id.* at 5.) This is in accordance with Defendant's FMLA policy, which provides that an employee requesting FMLA leave "may be required to furnish a medical certification form fully completed and executed by the attending health care provider . . . within fifteen days of such a request," and that "[f]ailure to submit the required medical certification may result in delay or denial of FMLA leave." (ECF No. 47-17 at 6.)

Defendant's policy provides further that "if Matrix does not receive the physician certification within 10 [business] days, a letter is mailed to the employee to say that the physician certification is not received" and that the employee must contact her physician "to make sure [the certification is] received prior to the deadline so that [the employee is not] denied . . . leave." (ECF No. 47-18 at 4.)

Also, according to the policy, "if the employee still has not submitted her FMLA paperwork after the expiration of the fifteen-day period, it is the policy of Defendant to provide the employee with a "silent five-day grace period" to turn in her certification. (*See id.* at 6.) If Matrix still has not received the employee's certification twenty days after the employee first called the intake center to request leave, the employee's request for leave will be denied. (*See id.*)

9

Lastly, a pertinent provision of the policy provides that "[e]mployees taking intermittent leave must report their absence to [Matrix] and follow their departmental notice requirements, unless unusual circumstances exist." (ECF No. 47-17 at 6.) Plaintiff's departmental notice requirements require any employee taking intermittent leave to call Defendant's staffing office to report any day they will miss because of their leave. (ECF No. 47-18 at 6–7.) Defendant's FMLA policy cautions employees that failure to provide this notice to Matrix and to follow departmental notice requirements could "result in unexcused absence[s] and . . . progressive corrective action." (ECF No. 47-17 at 6.)

ii.    *Plaintiff's request for personal leave failed to comply with Defendant's procedure*

Here, Plaintiff failed to submit her certification in accordance with the procedure described above and thus was not entitled to FMLA benefits for the personal leave requested. Plaintiff initiated her request for personal FMLA leave on October 18, 2016 by calling Matrix. (ECF Nos. 49 ¶ 17; 50-1 at 2–3.) The same day, Matrix emailed Plaintiff the Initial Letter and mailed her the Packet, both of which advised that it was her responsibility to ensure that her medical certification was completed within fifteen days of her intake session. (*See* ECF Nos. 47-19 at 3–5; 47-20 at 2.) Matrix also faxed Plaintiff's physician a copy of the medical certification to complete, which the physician appears to have received. (ECF No. 50-1 at 3, 7.) The next day, Plaintiff saw her doctor and notified her that she would need to complete Plaintiff's FMLA paperwork. (ECF No. 49 ¶ 17.) Thus, by October 19 at the latest, Plaintiff and her physician were on notice that Plaintiff needed to have her medical certification completed in order to receive FMLA leave. On October 22, Matrix faxed Plaintiff's physician another copy of Plaintiff's FMLA form. (ECF No. 50-1 at 3.) This too appears to have been

10

received.  (*Id.* at 7.)  Matrix sent a third such fax on October 27.  (*Id.* at 3, 7.)  On October 31, having not received Plaintiff's certification, Matrix sent Plaintiff the 10 Day Letter advising her that her certification had not been received and stating "[i]t is your responsibility to fax or mail completed documentation to Matrix within fifteen [days of your intake session]."  (ECF No. 47-24 at 4.)  The 10 Day Letter further advised "[i]f the documentation is not received by 11/07/2016 or if sufficient information is not provided in a timely manner, your leave may be denied."  (*Id.*)  On November 9, twenty-two days after Plaintiff's intake session, Defendant denied Plaintiff's request for personal FMLA leave.  (ECF No. 47-23.)

Even after this denial, Plaintiff's certification was not immediately forthcoming. According to Plaintiff, her doctor submitted the form for the first time on December 28, 2016. (ECF No. 49 ¶ 23.)  Matrix called Plaintiff the next day to tell her that her doctor's submission was incomplete and, in places, illegible.  (ECF No. 47-24 at 2.)  After another delay, Plaintiff's doctor submitted a completed form, which Matrix received on January 16, 2017, approximately three months after Plaintiff's intake session and more than two months after Plaintiff's request for leave was rejected.  (*See id.*)

As this undisputed evidence shows, Plaintiff failed to comply with Defendant's policy requiring her to submit a certification within fifteen days of her employer requesting it.  As such fifteen-day deadlines are explicitly permitted by 29 C.F.R. § 825.305(b), and as failure to submit such a certification is a valid reason for denying leave, *see, e.g.*, *Ryder*, 652 F. App'x at 235, the Court concludes that Plaintiff cannot prevail on her interference claim.

11

### iii.     *Plaintiff's counter-arguments fail*

Plaintiff offers four reasons why summary judgment is inappropriate despite her failure to file a timely certification. First, Plaintiff argues that her physician did not receive the certification form until October 27, 2016, thirteen days before Defendant rejected her claim. (ECF No. 48 at 11.) Even if this is true, it is immaterial.[2] Defendant was required to give Plaintiff fifteen days from the date it requested her health care certification—here, the date of her intake session—to submit a completed form; it was not required to give Plaintiff fifteen days from the time her doctor received the form. *See* 29 C.F.R. § 825.305(b).

Second, Plaintiff argues that she "did not receive notification from Matrix within 10 days that her physician had not responded [to the request to complete the certification] per [Defendant's] procedure." (ECF No. 48 at 11.) Plaintiff is mistaken as to Defendant's policy, which is to inform employees if Matrix has not heard from the employee's health care provider within ten *business* days. (*See* ECF No. 47-19 at 4.) Matrix provided this notification by sending Plaintiff her 10 Day Letter on October 31, ten business days after her October 18 intake meeting. (*See* ECF No. 47-24 at 4.)

Plaintiff's third argument is that she "was not required to submit the form on her own behalf per [verbal] instructions from Matrix." (ECF No. 48 at 11–12.) Even assuming Plaintiff did receive oral instructions to this effect, the undisputed evidence in the record establishes

---

[2] The Court notes that Plaintiff's assertion that her doctor only received the certification form on October 27, 2016 is not supported by evidence produced by either party. As discussed above, Matrix, in addition to faxing the form on October 27, also faxed the certification form to Plaintiff's doctor on October 18 and 22, and the form appears to have been received on both occasions. (*See* ECF No. 50-1 at 3, 7.) Furthermore, Plaintiff states that she told her doctor back on October 19 that the doctor needed to fill out Plaintiff's FMLA paperwork, meaning that both Plaintiff and her physician had ample notice that the paperwork needed to be completed. (*See* ECF No. 49 ¶ 17.)

that Defendant's FMLA policy, the Initial Letter, the Packet, and the 10 Day Letter all instructed Plaintiff that it was ultimately her responsibility to complete the certification. Furthermore, the latter three of these documents were sent to Plaintiff after she alleges Matrix told her she did not need to submit the form. The evidence further shows that Plaintiff had previously requested personal FMLA leave and been denied for failure to turn in her medical certification. (*See* ECF No. 47-22.) Thus, Plaintiff has failed to produce evidence that raises a genuine issue of material fact as to whether Plaintiff was aware that it was her responsibility to ensure that the certification was submitted on time in order to avoid denial of requested FMLA leave.

Plaintiff's fourth and final argument appears to be that even if Defendant correctly denied Plaintiff's FMLA request in November, it should have "retroactively designated approval of [Plaintiff's] FMLA leave request after receiving [her] completed form" in January 2017. (*See* ECF No. 48 at 12–13.) To the extent this is Plaintiff's argument, she provides no support for the proposition that an employer must abandon its own fifteen-day deadline for submitting FMLA paperwork by retroactively approving claims supported by paperwork submitted months after that deadline expired.[3]

In conclusion, Plaintiff's arguments do not alter this Court's conclusion that her interference claim fails because she failed to timely submit her medical certification, and thus she was not entitled to take her requested personal leave. Nor was Defendant required to retroactively designate approval of Plaintiff's leave, which Defendant declined in its discretion

---

[3] While "an employer and an employee can mutually agree that leave be retroactively designated as FMLA leave," such retroactive designation is permissive, not mandatory. 29 C.F.R. § 825.301(d); *Njaim v. FCA US LLC*, 764 F. App'x 513, 515 (6th Cir. 2019).

13

to do.  Accordingly, Defendant is entitled to judgment as a matter of law with respect to Plaintiff's interference claim.

## B.  Retaliation in Violation of the FMLA

Defendant next argues that it is entitled to summary judgment on Plaintiff's claim for FMLA retaliation.  (ECF No. 47 at 14–17.)  Section 2615(a)(2) of the FMLA forbids employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C. § 2615(a)(2).  Claims brought pursuant to § 2615(a)(2) are generally referred to as retaliation claims.  *See, e.g.*, *Adams*, 789 F.3d at 429; *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006).  The Fourth Circuit has held that "[r]etaliation claims brought under the FMLA are analogous to those brought under Title VII."  *Adams*, 789 F.3d at 429.  Accordingly, like Title VII claims, where there is no direct evidence of retaliatory animus, such claims are analyzed under the burden-shifting *McDonnell Douglas* framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).  To succeed on her retaliation claim, a plaintiff must first demonstrate a prima facie case showing: (1) that she "engaged in protected activity"; (2) that the defendant "took adverse action against [her]"; and (3) that the "adverse action was causally connected to the plaintiff's protected activity."  *Yashenko*, 446 F.3d at 551 (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)).  If a plaintiff makes this showing, "then a presumption of retaliation arises."  *Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 191 (4th Cir. 2017).  The defendant must then offer a nonretaliatory explanation for the adverse action.  *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016).  The burden then shifts back to Plaintiff to establish that

14

Defendant's proffered explanation is pretext for FMLA retaliation. *Id.* "Accordingly, to survive summary judgment on an FMLA retaliation claim, the plaintiff must produce sufficient evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude the adverse employment action was taken for an impermissible reason, i.e., retaliation." *Waag*, 857 F.3d at 192 (quotation omitted).

Here, Defendant argues that Plaintiff cannot make a prima facie showing of retaliation because "she has not demonstrated a causal connection between her [protected activity] and her termination." (*See* ECF No. 47 at 14–16.) Further, according to Defendant, "even if Plaintiff could make a prima facie showing, her claim for retaliation fails because there [were] clear and legitimate non-retaliatory reason[s] for the termination" and "Plaintiff cannot show that these reasons were pretextual." (*See id.* at 16.) Plaintiff argues, in response, that a causal connection does exist between her protected activities and her termination and that Defendant's stated reasons for firing her were pretextual. (ECF No. 48 at 15–19.) As explained below, while the Court finds that Plaintiff has stated a prima facie claim of FMLA retaliation, she has failed to put forward evidence that would allow a reasonable jury to conclude that Defendant's proffered explanation for her discharge was a pretext for FMLA retaliation. Accordingly, Defendant's motion for summary judgment must be granted as to Plaintiff's retaliation claim.

### i. *Plaintiff establishes a prima facie case of retaliation*

To make out a prima facie case of retaliation, Plaintiff must first demonstrate that she engaged in a protected activity. *Yashenko*, 446 F.3d at 551. Here, Plaintiff asserts she was engaged in two protected activities: taking parental FMLA leave and applying for personal

FMLA leave. (*See* ECF No. 48 at 14, 17.) As both taking and attempting to take FMLA leave are protected activities, Plaintiff has satisfied the first element of her prima facie case. *See* 29 U.S.C. § 2615(a)(1) (prohibiting employers from interfering with the attempted exercise of any right created by the FMLA); *Moss v. City of Abbeville*, 740 F. Supp. 2d 738, 744 (D.S.C. 2010) ("The Fourth Circuit has held that taking FMLA leave is a protected activity under the FMLA and recognizes a cause of action for retaliation where an employee alleges that he was discharged for taking FMLA leave."). The second element of Plaintiff's prima facie case is also easily satisfied—Defendant took an adverse action against Plaintiff when it fired her. *Yashenko*, 446 F.3d at 551.

The third element of Plaintiff's prima facie case, which requires Plaintiff to show a causal connection between her protected activity and her adverse employment action, has likewise been satisfied. Plaintiff relies on the temporal proximity between her protected activities and her termination to establish this connection. (*See* ECF No. 48 at 17.) This is appropriate as a plaintiff may satisfy the third element of her prima facie case by alleging a sufficiently close temporal proximity between the adverse employment action she suffers and the protected activity she engages in. *Yashenko*, 446 F.3d at 551; *Waag*, 857 F.3d at 192. Here, there is close temporal proximity between Plaintiff's discharge on January 20, 2017 and both of her protected activities. Plaintiff's attempt to take personal leave was ongoing as of January 16, 2020, the day her doctor finally completed her medical certification. Thus, a mere four days separated Plaintiff's attempt to exercise her FMLA right from her termination. This is sufficient to show a causal connection. *See Boone v. Bd. of Governors of the Univ. of N.C.*, No. 1:17CV113, 2018 WL 1620971, at *6 (M.D.N.C. Mar. 30, 2018) (holding that that a plaintiff

satisfied the third element of a retaliation claim by alleging a gap of approximately two months between the end of her FMLA leave and her termination). Similarly, Plaintiff last engaged in the protected activity of taking leave to care for her father on December 21, 2016, less than a month before she was fired. (*See* ECF No. 47-27.) Once again, this gap between protected activity and adverse action is short enough to establish the causal connection required to make out the third element of Plaintiff's prima facie case. *See Boone*, 2018 WL 1620971, at *6. Plaintiff has therefore established a prima facie claim of FMLA retaliation.

*ii.       Defendant's reason for termination and Plaintiff's evidence of pretext*

Once a terminated FMLA plaintiff establishes a prima facie case of retaliation, the burden shifts to her employer to articulate a legitimate, nonretaliatory reason for discharging her. *See Vannoy*, 827 F.3d at 304. Here, Defendant has met that burden by proffering the following explanation for firing Plaintiff: "Plaintiff's employment was terminated not just because of poor attendance and failure to submit a required checklist, but also because of serious medical errors that jeopardized patient safety." (ECF No. 47 at 16.)

As Defendant has satisfied its burden of articulating a legitimate, nonretaliatory reason for Plaintiff's termination, the presumption of retaliation that comes with Plaintiff making out her prima facie case "drops from th[is] case," leaving Plaintiff the task of showing by a preponderance of the evidence that Defendant's stated reasons were merely a pretext for retaliation. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 255 & n.10 (1981). Plaintiff can achieve this task "directly by persuading the [C]ourt that a [retaliatory] reason more likely motivated [Defendant] or indirectly by showing that [Defendant's articulated reasons for termination are] unworthy of credence." *Id.* at 256; *Waag*, 857 F.3d at 191–92.

17

Plaintiff offers several arguments related to pretext. First, Plaintiff argues that Defendant improperly disciplined her for missing work to take FMLA-approved leave and that absent this discipline, she would not have been terminated. (ECF Nos. 48 at 14–17.) During their January 13 meeting, Phillips and Plaintiff discussed Plaintiff's alleged unexcused absence from work on six dates in 2016: September 14 and 28, November 15, and December 16, 19, and 22. (ECF Nos. 47-26; 49 ¶ 28.) The evidence shows that while Plaintiff was absent without leave on four of these six days, it appears that she had permission to be absent on September 28, and that there is a dispute about whether she was in fact absent on December 22. However, Plaintiff has not offered any argument as to how this evidence demonstrates retaliatory animus rather than sloppy paperwork. Moreover, Plaintiff's attendance history must also be considered in context. Defendant has never argued—and Plaintiff has produced no evidence showing—that Plaintiff was fired solely or even primarily because of her attendance issues. Rather, the evidence shows that Plaintiff's attendance was but a reason among reasons for her discharge, (*see* ECF No. 47-1), and whether she was absent four days without leave or six days without leave does not appear to be material to the issue of pretext.

Next, Plaintiff argues that she is being unfairly blamed for the Vaccination Incident. (ECF No. 48 at 18.) As discussed above, the Vaccination Incident occurred immediately after Plaintiff's meeting with Phillips and Hunter and appears to have convinced Defendant to fire Plaintiff. (*See* ECF No. 47-1.) Plaintiff has offered evidence indicating that another nurse, Glime, was more to blame for the incident than she was, as it was Glime who administered the second vaccination. However, Plaintiff has not denied that she was part of a chain of miscommunication that resulted in a medical error that jeopardized patient safety, which was

18

what Defendant articulated as to why the incident was factored into its ultimate decision to fire her. (*See id.* (explaining that Plaintiff "gave patient information in [a] report that led to medical error").) Again, Plaintiff does not demonstrate how this shows retaliatory animus.

Though Plaintiff advances three additional arguments for why the Court should conclude that Defendant's articulated reason for firing her is merely a pretext for retaliation, they likewise fail. Plaintiff first asserts that Defendant has offered shifting explanations for its decision to fire Plaintiff. (ECF No. 48 at 15–16.) While "[t]he fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002), the record does not support this claim by Plaintiff here. Rather, the record shows that since the day Plaintiff was fired, Defendant has contended that her termination was the result of a combination of four factors: (1) her attendance issues; (2) her skills checklist; (3) the Rapid Response Incident; and (4) the Vaccination Incident. (ECF Nos. 47-1; 47-15 at 6; 50 at 7–8.) This sort of consistency is not suggestive of pretextual decision making.[4] Plaintiff next argues that Defendant's normal policy for discharging an employee called for the employee to meet with her supervisors to discuss her work performance and that the Court should infer pretext based on Defendant's alleged failure to have such a conversation with Plaintiff prior to firing her. (*See* ECF Nos. 48 at 16; 48-27 at 3.) However, the record shows that Plaintiff's supervisors met with her twice in January 2017 to discuss her work performance before firing

---

[4] Plaintiff's citations to the record illustrate, at most, that Plaintiff's discharge was primarily motivated by the Rapid Response and Vaccination incidents. (*See* ECF Nos. 41 ¶ 20 ("It is admitted that Plaintiff was terminated on January 20, 2017 after giving wrong patient information resulting in a medication error."); 47 at 3 ("Plaintiff's employment was terminated principally because of [the Rapid Response Incident and the Vaccine Incident].").)

her.  (ECF Nos. 47-1; 47-9; 47-11.)  Finally, Plaintiff appears to argue that the Court should infer FMLA retaliation from the fact that Defendant contemplated re-opening Plaintiff's request for personal FMLA leave but failed to do so.  (ECF No. 48 at 16.)  During the few days separating January 16—when Plaintiff's doctor completed her medical certification—and January 20—when Plaintiff was fired—employees of Defendant and Matrix corresponded regarding the possibility of "overturning the denial [of Plaintiff's request for personal FMLA leave] and re-opening her claim."[5]  (ECF No. 48-28 at 2.)  The Court is at a loss to see how this indicates Defendant acted pretextually when it fired Plaintiff.  In fact, this evidence shows that until the very moment Plaintiff was fired, Defendant and Matrix were receptive to approving her request for leave.

In contrast, Defendant has brought forward considerable evidence supporting its reasons for termination and rebutting the idea that it was hostile to Plaintiff or any other employee taking FMLA leave.  Regarding Defendant's articulated reason for discharging Plaintiff—that she was fired because of the combination of four issues with her work performance—the record demonstrates that Plaintiff failed to turn in her skills checklist as required and that she had at least four unexcused absences in the months preceding her termination.  The record also demonstrates that Plaintiff was part of two medical situations that seriously concerned her supervisors and compromised patient safety.  (*See* ECF Nos. 47-1; 47-9.)  In addition, Defendant has a substantial history of accommodating Plaintiff's requests for FMLA leave.  Plaintiff took personal FMLA leave that expired without incident

---

[5] A Matrix representative also informed Plaintiff on December 29, 2016 that once Plaintiff submitted a completed medical certification, Matrix would "reach back to her HR to confirm if the denial could be overturned or not."  (ECF No. 47-24 at 2.)

in April of 2016, and she was taking FMLA leave for her father, again, largely without incident, at the time of her discharge. (*See* ECF Nos. 47-27 (listing approved absences for parental leave); 49 ¶¶ 12, 16.) Moreover, as discussed above, as late as mid-January 2020, Defendant was considering retroactively granting Plaintiff's request for personal FMLA leave, despite being under no legal obligation to do so. (*See* ECF No. 48-28 at 2.) The Court concludes that Plaintiff has therefore failed to put forward evidence that would allow a reasonable factfinder to determine that Defendant's legitimate, nonretaliatory reason was a pretext for FMLA retaliation. Defendant is therefore entitled to summary judgment as to Plaintiff's retaliation claim.

### C. Wrongful Discharge in Violation of the ADEA

Next, Defendant argues that Plaintiff cannot establish a violation of the ADEA and thus that Defendant is entitled to summary judgment as a matter of law. (ECF No. 47 at 17–21.) The ADEA makes it unlawful for an employer to discharge an individual over 40 because of their age. 29 U.S.C. §§ 623(a)(1); 631(a). "To demonstrate a claim of age discrimination under the ADEA, a plaintiff must either provide direct evidence of discrimination or demonstrate a prima facie case of discrimination." *Witzke v. Pepsi Bottling Ventures, LLC*, 773 F. App'x 130, 131 (4th Cir. 2019). "Regardless of which theory the plaintiff pursues, [s]he must establish by a preponderance of the evidence 'that age was the 'but-for' cause of the challenged employer decision.'" *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). That is, "the employee must prove that the employer *would not have fired her* in the absence of age discrimination." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019).

To establish a prima facie case of age discrimination, a plaintiff must prove that "(1) at the time of her firing, she was at least 40 years of age; (2) she was qualified for the job and performing in accordance with her employer's legitimate expectations; (3) her employer nonetheless discharged her; and (4) a substantially younger individual with comparable qualifications replaced her." *Id.* If Plaintiff succeeds in establishing a prima facie case of her claim, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quotation omitted). If the defendant satisfies this burden, the presumption of discrimination created by the prima facie case disappears and the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's proffered justification is pretextual. *See Westmoreland*, 924 F.3d at 726.

Here, Plaintiff seeks to advance her claim of age-discrimination based on the *McDonnell Douglas* burden-shifting analysis. (ECF No. 48 at 20.) Defendant does not dispute that Plaintiff was over the age of forty when she was discharged or that she was replaced by a much younger individual. (*See* ECF No. 47 at 17–21.) Defendant does, however, argue that Plaintiff's ADEA claim fails for three reasons. First, Defendant contends Plaintiff failed to file a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at 17–18.) Second, it argues that Plaintiff cannot make out a prima facie case of age discrimination because she was not meeting Defendant's legitimate job expectations. (*Id.* at 20.) Finally, Defendant asserts that Plaintiff cannot show that Defendant's articulated

22

reasons for discharging her were pretextual. (*Id.* at 20–21.)  The Court concludes (1) that Plaintiff has failed to establish that she was meeting Defendant's legitimate job expectations, and (2) that even assuming Plaintiff could show a prima facie case of age discrimination, she has not shown that Defendant's reasons for firing her were a pretext for age discrimination.[6]

        i.        *Plaintiff fails to show she was meeting Defendant's legitimate job expectations*

In order to make out a prima facie case of age discrimination, Plaintiff must show by a preponderance of the evidence that she was meeting her employer's legitimate job expectations.  A job expectation is "legitimate" so long as it is bona fide.  *Smith v. Premier Prop. Mgmt.*, 793 F. App'x 176, 179 (4th Cir. 2019).  Conversely, a job expectation is illegitimate if it is a "sham designed to hide the employer's discriminatory purpose."  *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006) (quoting *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002)).  Because "[i]t is the employer's point of view that controls whether the employee is satisfactorily meeting expectations," plaintiffs cannot rely on their own testimony or the opinion of third parties or co-workers to establish a genuine issue of fact regarding this prong of the prima facie case.  *See Arthur v. Pet Dairy*, 593 F. App'x 211, 217 (4th Cir. 2015) (explaining that whether an employee was meeting their employer's legitimate expectations depends on the employer's perception, and not the opinions of the plaintiff's coworkers); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (citations omitted)); *Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 523 (E.D. Va. 2013), *aff'd* 603 F. App'x (4th Cir. 2015).  Nor can plaintiffs rely on dated employer evaluations from the months or years before their

_____

[6] Because the Court so concludes, it need not address Defendant's EEOC argument.

discharge to claim they were meeting expectations at the time of their discharge. *See Warch*, 435 F.3d at 516–17 (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir. 1995) (concluding that a positive performance review for 1989 was "irrelevant" to the question of whether plaintiff was performing well at the time he was fired in August of 1990), *rev'd on other grounds*, 517 U.S. 308 (1996))).

Here, Plaintiff has supplied several pieces of evidence indicating that she was meeting Defendant's legitimate job expectations, all of which are of little to no probative value. First, Plaintiff propounds her own subjective belief that "[a]t the time of [her] termination, she was qualified for her job and was performing in accordance with her employer's legitimate expectations." (ECF No. 48 at 20.) As discussed above, Plaintiff's opinion is irrelevant to how her employer regarded her work performance. Next, Plaintiff submits that "she received positive peer review appraisals and was nominated for an exceptional people award." (*See id.* at 21; 48-32 at 16.) Any peer appraisal is of little relevance for the same reason.[7] Plaintiff's nomination for an "Exceptional People Award" is slightly more probative as it came with a recognition—albeit apparently in a form letter—of her "great contributions" to Defendant. (ECF No. 48-32 at 16.) However, this nomination occurred in January of 2015 and thus tells the Court little about Plaintiff's performance at the time she was fired in January 2017. Finally, Plaintiff points to stale positive reviews from her supervisors, the most recent of which is from 2013, too long ago to be relevant here. (*Id.* at 5–6.)

---

[7] Plaintiff was also nominated by a coworker for employee of the month in November of 2014—a nomination distinct from her exceptional employee nomination. (ECF No. 48-32 at 16–17.) As this was a peer nomination, it is of little relevance to this inquiry.

24

In contrast, Defendant has put forward substantial evidence demonstrating that Plaintiff was not meeting job expectations at the time she was fired. As discussed above, the undisputed evidence in the record indicates that Plaintiff did not turn in her skills checklist as required and was having attendance issues—missing work to take personal FMLA leave for which she was not approved and failing to properly inform Defendant when she was going to take intermittent FMLA leave to care for her father. Defendant also produced evidence that Plaintiff committed two serious medical errors within a week of her termination. Regarding the Rapid Response Incident, Plaintiff does not deny that she waited an hour after the patient started showing symptoms of an allergic reaction before contacting the RRT. (*See* ECF No. 47-9.) According to the chief nursing officer at Plaintiff's hospital, a nurse should be expected to activate the RRT "if a patient is experiencing an anaphylactic reaction" and should be disciplined for failure to do so. (ECF Nos. 47-7 at 4; 48-18 at 4.) Furthermore, as discussed above, another medical professional at Plaintiff's hospital reached out to Plaintiff's supervisors following the Rapid Response Incident to express her concerns about Plaintiff asking to leave the patient to care for other patients. (ECF No. 47-10.) This email troubled Phillips, and thus during her January 13 meeting with Plaintiff, Phillips warned Plaintiff that she needed to be an "advocate for our [patients] and . . . could be terminated if she left a [patient] in an emergency situation." (ECF No. 47-9.) During the other incident, Plaintiff, in the words of Hunter, "gave patient information in [a] report that led to [a] medical error." (ECF No. 47-1.) Plaintiff disputes that she was at fault in either episode. (*See* ECF No. 49 ¶¶ 30, 41.) However, it is Defendant's perception that matters here, and Plaintiff has failed to produce evidence that raises a genuine dispute of material fact as to whether she was meeting

25

Defendant's legitimate job expectations in January of 2017. Plaintiff has therefore failed to make a prima facie case of age discrimination.

        ii.     *Plaintiff fails to raise a genuine issue of fact as to pretext*

Assuming *arguendo* that Plaintiff could make out her prima facie case, she has failed to establish a legally sufficient evidentiary basis for a jury to conclude that Defendant's conduct was a pretext for age discrimination. In fact, Plaintiff has not even attempted to make such a showing—her brief addresses her prima facie case and then comes to an abrupt end. (*See* ECF No. 48 at 20–21.) This failure to brief is understandable given the paucity of support in the record for a finding of age discrimination. Plaintiff's only evidence that she was a victim of age discrimination is that she was 59 when she was fired and that she "was one of the oldest" employees in her unit. (ECF No. 47-33 at 3–4.) This is far too thin to carry Plaintiff's burden of putting forward evidence that could convince a jury that Defendant's legitimate, nondiscriminatory reason was false, and that Plaintiff was actually fired because of her age. If such proof was sufficient, then the mere fact that an employee made out a prima facie case and believed that she was a victim of discrimination would suffice to withstand summary judgment, a proposition the Fourth Circuit recently rejected. *See Smith*, 793 F. App'x at 178 ("Smith's subjective belief that her supervisors were motivated by age bias does not suffice to withstand summary judgment on this issue."). Accordingly, Defendant is entitled to summary judgment as a matter of law on Plaintiff's ADEA claim.

### D. Wrongful Discharge in Violation of North Carolina Public Policy

Plaintiff's final claim is that Defendant "wrongfully and intentionally discriminated against [Plaintiff] on account of her age in violation of . . . [N.C. Gen. Stat. § 143-422.2]."

(ECF No. 34 ¶ 43.) As "North Carolina law applies the same standards as the ADEA," Defendant is entitled to summary judgment on this claim. *See Smith*, 793 F. App'x at 177 n.1 (citing *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 875 (M.D.N.C. 2003)); *Norman v. Call-A-Nurse, LLC*, No. 1:16CV1388, 2018 WL 6329391, at *6 (M.D.N.C. Dec. 4, 2018) (concluding that plaintiff's "state law claim for wrongful termination based on age discrimination must . . . fail" as it was "based on the same factual allegations as [p]laintiff's [unsuccessful] ADEA claim"), *aff'd* 783 F. App'x 307 (4th Cir. 2019).

For the reasons outlined in the Memorandum above, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment, (ECF No. 46), is GRANTED and Plaintiff's claims against Defendant are hereby DISMISSED WITH PREJUDICE.

This, the 21st day of May 2020.

/s/Loretta C. Biggs
United States District Judge